# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                    Crim. No. 08-142 (DSD/SRN)

       Plaintiff,

    v.                                   <u>REPORT AND RECOMMENDATION</u>

Mohammad Queadir Abdul-Ahad (01),
James Edward King (02), Akbar Saleem
Abdul-Ahad (07), Michael Douglas Reid
(12), Donte Martin (15), Kevin Lewis (20),
and Chiffon Williams (23),

       Defendants.

---

Nancy Brasel and Anders Folk, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

Craig Cascarano, Cascarano Law Office, 150 South Fifth Street, Suite 3260, Minneapolis, Minnesota 55402, for Defendant Mohammad Queadir Abdul-Ahad

Barry Voss, Barry Voss PA, 527 Marquette Avenue South, Suite 1050, Minneapolis, Minnesota 55402, for Defendant James Edward King

Thomas Dunnwald, Dunnwald & Peterson PA, 412 South Fourth Street, Suite 1150E, Minneapolis, Minnesota 55415, for Defendant Akbar Saleem Abdul-Ahad

Paul Schneck, Paul Daniel Schneck, Ltd., 701 Fourth Avenue South, Suite 500, Minneapolis, Minnesota 55415, for Defendant Michael Douglas Reid

William Orth, Orth Law Office, 247 Third Avenue South, Suite 100, Minneapolis, Minnesota 55415, for Defendant Donte Martin

James Sheehy, Sheehy Law, Ltd., 247 Third Avenue South, Minneapolis, Minnesota 55415, for Defendant Kevin Lewis

Michael Colich, Colich & Associates, 10 South Fifth Street, Suite 420, Minneapolis, Minnesota 55402, for Defendant Chiffon Williams

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Mohammad Queadir Abdul-Ahad's Motion to Suppress Confessions or Admissions (Doc. No. 390), Motion to Suppress Search and Seizure Evidence (Doc. No. 392), and Motion to Suppress Evidence Obtained Through Search (Doc. No. 394); James Edward King's Motion to Dismiss Counts One and Two of the Indictment (Doc. No. 264); Akbar Saleem Abdul-Ahad's Motion to Suppress Search and Seizure Evidence (Doc. No. 354); Michael Douglas Reid's Motion to Suppress Statements (Doc. No. 524), Motion to Suppress Identification (Doc. No. 525), Motion to Suppress Evidence Obtained from Search and Seizure (Doc. No. 533), and Motion to Suppress Evidence Obtained from Electronic Surveillance and Wiretapping (Doc. No. 534); Donte Martin's Motion to Suppress Evidence (Doc. No. 461), Motion to Suppress Statements (Doc. No. 462), and Motion to Suppress Electronic Surveillance (Doc. No. 467); Kevin Lewis' Motion to Suppress Statements (Doc. No. 324), Motion to Suppress Wiretap Evidence (Doc. No. 326), Motion to Suppress Eyewitness Identifications (Doc. No. 327), Motion to Suppress Eyewitness Identifications (Doc. No. 328), Motion to Suppress Evidence Obtained from Search and Seizure (Doc. No. 332), and Amended Motion to Suppress Evidence Obtained from Search and Seizure (Doc. No. 511); and Chiffon Williams's Motion to Suppress Evidence (Doc. No. 216) and Motion to Suppress Evidence Obtained from Electronic Surveillance and Wiretapping (Doc. No. 217).[1]  This case has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

---

[1] The Court will address the parties' non-dispositive motions in a separate Order.

I.      **Motions to Suppress Statements, Confessions, or Admissions**

Mohammad Abdul-Ahad, Michael Reid, Donte Martin, and Kevin Lewis move to suppress statements, confessions, and admissions to law enforcement agents.  At the motion hearing, Mohammad Abdul-Ahad orally withdrew his motion, and his motion should accordingly be deemed withdrawn.  Both Michael Reid and Donte Martin conceded they made no custodial statements to law enforcement, and their motions should therefore be denied as moot.  Kevin Lewis said he was not challenging the statement he made, and his motion should consequently be denied.

II.     **Motions to Suppress Evidence Obtained from Searches and Seizures**

Mohammad Abdul-Ahad, Akbar Abdul-Ahad, Michael Reid, Donte Martin, Kevin Lewis, and Chiffon Williams move to suppress evidence seized pursuant to eight search warrants (Gov't Exs. 5, 6, 7, 8, 9, 10, 11, 12).  Other than Donte Martin, none of the Defendants articulated any specific legal or factual basis to suppress the evidence.  They simply ask the Court to review the supporting affidavits for probable cause.  This Court signed the search warrants at Government's Exhibits 7 and 12, and therefore, asked the Honorable Jeffrey J. Keyes to conduct an independent review of these search warrants.

With respect to Donte Martin, he argues that the search warrant executed at 3411 Emerson Avenue North, Minneapolis, Minnesota (Gov't Ex. 12) was obtained in large part due to his allegedly illegal vehicle stop and arrest on March 11, 2008.  This Court will consider the legality of that stop and arrest of Donte Martin on March 11, 2008, and whether the warrant was a poisonous fruit of law enforcement's actions.  In addition to challenging the search warrants, Donte Martin and Kevin Lewis also seek to suppress evidence seized from the vehicle pursuant to the stop on March 11, 2008.

3

### A.    Government Exhibit 5

Government Exhibit 5 contains a search warrant for 2626 Cedar Avenue South in Minneapolis, Minnesota.  Officer Michael Kaneko attested in a supporting affidavit on February 10, 2003, that he had received information from three confidential reliable informants (CRIs) that the occupants of 2626 Cedar Avenue South were dealing crack cocaine and marijuana. Officer Kaneko knew the CRIs to be reliable based on past information they had given.  The CRIs identified the occupants of 2626 Cedar Avenue South as Chiffon Williams and her son, Mohammad Abdul-Ahad.  One of the CRIs had seen large amounts of cocaine and marijuana in the residence, as well as three guns, within seventy-two hours of the application for the warrant. Officer Kaneko conducted surveillance on the residence and observed heavy foot and vehicle traffic during nighttime hours.

A reviewing court should accord "great deference" to a determination of probable cause. Illinois v. Gates, 462 U.S. 213, 236 (1983) (citation omitted).  The duty of a judge who signs a warrant is "to make a practical, common-sense decision whether, given all the circumstances . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Id. at 238.  The task for the reviewing court is to ensure there was "a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing."  Id. at 236 (quotation omitted) (ellipsis and modification in Gates).  Here, the Court concludes that Officer Kaneko's affidavit provided sufficient probable cause to believe that evidence of the storage and distribution of illegal narcotics would be found at 2626 Cedar Avenue South.

### B.    Government Exhibit 6

Government Exhibit 6 contains a second search warrant for 2626 Cedar Avenue South, as well as the attached garage, a 1999 Dodge Caravan, a 2006 Land Rover, and all occupants of the

property.  The affiant, Officer Lucas Peterson, attested in a supporting affidavit on January 25, 2007, that he had received information from a CRI that narcotics were being stored, packaged, and sold at 2626 Cedar Avenue South.  The CRI identified one of the sellers as "Omar," who Officer Peterson learned was Steven Mitchell Gant.  The CRI identified another one of the dealers as "Shifty," who Officer Peterson knew from past experience was Chiffon Williams.  The CRI said he had seen Omar in the possession of more than an ounce of powder cocaine, several grams of cooked cocaine, marijuana, and a black semiautomatic handgun.  The CRI also said he had seen Omar conceal a small amount of cocaine in the door of the Caravan and then deliver the narcotics to another individual.  The CRI told Officer Peterson he had seen Shifty sell crack cocaine and marijuana from the Land Rover to people on the street.  Officer Peterson conducted surveillance on Steven Gant, Chiffon Williams, and the residence, and he saw activity consistent with information received from the CRI and with drug trafficking in general.  The information contained in Officer Peterson's affidavit provided ample probable cause for the search warrant.

### C.    Government Exhibits 8, 9, 10, and 11

Government Exhibits 8, 9, 10, and 11 all contain the same supporting affidavit, which was prepared by Special Agent Jim Shoup of the Internal Revenue Service.  The affidavit supported search warrants issued for safe deposit box #403, located at 4701 Chicago Avenue South in Minneapolis, Minnesota (Gov't Ex. 8); 2929 Chicago Avenue South in Minneapolis, Minnesota (Gov't Ex. 9); Unit 1 of 478 Marshall in St. Paul, Minnesota (Gov't Ex. 10); and 2626 Cedar Avenue South in Minneapolis, Minnesota (Gov't Ex. 11).  In the twenty-four page affidavit, Agent Shoup explained that Mohammad Abdul-Ahad, James King, and Chiffon Williams were being investigated for drug trafficking and money laundering.  He recounted numerous instances of drug trafficking, explained the suspected gang affiliations of Mohammad

5

Abdul-Ahad and James King, detailed information obtained from multiple sources and informants, listed contraband seized pursuant to an earlier search warrant, and provided several instances of suspected money laundering.

Agent Shoup had learned through his investigation that Mohammad Abdul-Ahad was not employed and had no sources of income but wore expensive jewelry, purchased expensive vehicles, and had deposited more than $42,000 cash into the City-County Federal Credit Union, located at 4701 Chicago Avenue South, over a three-year period of time.  Agent Shoup also learned that Mohammad Abdul-Ahad rented safe deposit box #403 at that credit union.

With respect to 2929 Chicago Avenue South, Agent Shoup had obtained records showing that Mohammad Abdul-Ahad had renter's insurance for Unit 316 of that address.  Vehicle insurance records for a 2006 Charger and a 2006 Land Rover, both of which had been associated with prior money laundering and drug transactions, listed that address.  Phone records for the telephone at 2929 Chicago Avenue South, Unit 316, were in Mohammad Abdul-Ahad's name, and Mohammad Abdul-Ahad's name was on the electronic directory for the building.

Unit 1 of 478 Marshall is an apartment rented by Rae McDonough, the girlfriend of Mohammad Abdul-Ahad.  In his affidavit, Agent Shoup detailed several instances of alleged money laundering by McDonough, her mother, and Chiffon Williams' mother involving the 2006 Charger and 2006  Land Rover.  Agent Shoup also connected McDonough to a suspected drug transaction by Mohammad Abdul-Ahad in Houston, Texas, on March 7 and 8, 2008.  Based on his experience, Agent Shoup knew that drug dealers frequently use their girlfriends to conduct transactions on their behalf and keep records at their girlfriend's home.

With respect to the third search warrant for 2626 Cedar Avenue South in Minneapolis, Agent Shoup had learned from several sources of information that crack cocaine was stored and

6

sold from that residence.  He knew that Chiffon Williams was the owner of the home.  Three vehicles involved in the suspected money laundering and drug transactions were registered to that address.  Agent Shoup observed Mohammad Abdul-Ahad coming and going from 2626 Cedar Avenue South, and Mohammad Abdul-Ahad's driver's license listed that address.

The Court finds that Agent Shoup's affidavit provided probable cause to search the safe deposit box, Unit 316 of 2929 Chicago Avenue South, Unit 1 of 478 Marshall, and 2626 Cedar Avenue South in Minneapolis.

**D.    The Traffic Stop on March 11, 2008**

Donte Martin and Kevin Lewis challenge the legality of a vehicle stop on March 11, 2008, and the resulting searches and seizures.

By March 2008, law enforcement officers had been investigating Akbar Abdul-Ahad and Steven Gant for some time.  On March 8, 2008, pursuant to an authorized wiretap, Agent David Voth of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) intercepted a telephone call between Marques Martin and Akbar Abdul-Ahad, in which Marques Martin said, "You already know, I have been rolling like this for days."  (Hr'g Tr. at 166.)  Based on his experience with monitoring and interpreting coded language, Agent Voth believed this statement to mean that Marques Martin had been carrying a firearm for several days.  The next day, on March 9th, Akbar Abdul-Ahad called Marques Martin and told him to "be ready."  (Id. at 168.) The following day, the two men discussed the "power move," which they expected to happen by the end of the week.  (Id.)  Marques Martin also said the move would benefit "everybody" in that everyone would "eat."  (Id.)  Agent Voth interpreted these statements to mean that Akbar Abdul-Ahad and Marques Martin intended to obtain and distribute some form of contraband, drugs or money, to members of the suspected conspiracy.  In other intercepted calls, Akbar

Abdul-Ahad and Marques Martin referred to a "stash" belonging to Buster Gaston.  (Id. at 176.)

On March 11, 2008, Marques Martin called Akbar Abdul-Ahad and said he was ready. Akbar Abdul-Ahad then called Gaston and asked when Gaston had to report to the Hennepin County workhouse.  Gaston told him 11:00 p.m.  Akbar Abdul-Ahad called Marques Martin and gave him this information, and Marques Martin said "we" were leaving and "we" would be there by 10:15 p.m.  (Id. at 170.)  During the next intercepted call, a reference was made to the location of Gaston's girlfriend, Laura Coquila, at a Perkins Restaurant on White Bear Avenue in St. Paul, Minnesota.  Marques Martin said words to the effect of "that is where we are going to get her" or "that is where we will grab her."  (Id. at 171, 175.)  From the content of the intercepted calls, Agent Voth believed that Marques Martin and his passengers intended to commit a violent crime against Gaston or his girlfriend, specifically, an armed robbery, home invasion, or carjacking, with the objective of obtaining drugs or money.  Agent Voth also knew that Marques Martin had four previous convictions for violent felony crimes and was likely carrying a firearm.  In Agent Voth's experience, armed robberies are usually carried out by multiple individuals so that at least one person can control the victim while one or more individuals search for items.

Agent Voth believed that Marques Martin and his associates intended to cause critical harm to Coquila, and he wanted to prevent that from happening.  He therefore sent a surveillance team to the Hennepin County workhouse.  There was constant, real-time communication between the officers conducting surveillance and the officers monitoring the wiretap.  The information reported by the surveillance team was consistent with the details learned from the intercepted phone calls.  Officer Randy Olson was one of the officers stationed at the workhouse. He informed the surveillance team when Marques Martin's vehicle, a blue Tahoe, arrived in the

parking lot, and said that multiple people were in the vehicle.  Officer Olson knew that Marques Martin was sitting in the front passenger seat of the Tahoe because he could see Marques Martin use his phone, and Marques Martin's actions correlated with the information the wiretap monitors were hearing.

By the time of the next intercepted call between Marques Martin and Akbar Abdul-Ahad, Marques Martin was parked in the parking lot of the workhouse.  He asked Akbar Abdul-Ahad if he was supposed to be looking for "the white bitch" and asked what vehicle she would be driving.  (Id. at 173.)  There was some confusion whether Gaston and Coquila would be in a white Navigator or a maroon Range Rover.  At approximately 10:37 p.m., surveilling officers saw a white Navigator with a female driver and a male passenger arrive at the workhouse.  The license plate was registered to Gaston.  The Navigator pulled through a circle drive, where the passenger exited, and the vehicle departed.  Marques Martin was not sure if Coquila was driving the Navigator, and he called Akbar Abdul-Ahad, who said she was not in that vehicle.  By 11:00 p.m., however, Marques Martin realized he had missed Gaston and Coquila, and he called Akbar Abdul-Ahad again.  Marques Martin said, "we still here" and "we have been here."  (Id. at 203.) Marques Martin said he thought Coquila had been driving the Navigator, and Akbar Abdul-Ahad then confirmed that Gaston also owned a Navigator.  Marques Martin left the workhouse parking lot after this conversation.  Approximately thirty minutes had passed since Coquila left.  Agent Voth directed a surveillance team to stop Marques Martin's car based on his belief that Marques Martin was armed and intended to find and harm Coquila.

Officer Olson and other officers conducted a felony traffic stop of the Tahoe and ordered the occupants out of the car.  Marques Martin, Donte Martin, Jimmy Martin, and Kevin Lewis were removed from the vehicle, searched, and arrested.  Officers found a handgun under the

front passenger seat.  All four men were arrested based on law enforcement's belief that the group intended to collectively commit a violent crime against Coquila.  This belief was founded on Marques Martin's use of the word "we" throughout his conversations with Akbar Abdul-Ahad, and because the men were present in the Tahoe with Marques Martin at the time he intended to commit the violent act.

In Terry v. Ohio, the United States Supreme Court held that a law enforcement officer may stop, briefly detain, and question a person believed to be engaging in criminal activity.  392 U.S. 1, 20-24 (1968).  The officer must have a reasonable and articulable suspicion of criminal activity in order to conduct this type of investigatory detention.  Id. at 21-22.  A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent.  Id. at 21.  If the suspect is in a moving vehicle, a traffic violation is not required in order to justify the stop.  See United States v. Hensley, 469 U.S. 221, 226 (1985).  Even when there is no probable cause for the stop, and only a reasonable suspicion of criminal activity, a protective search for weapons will be constitutional if the officer reasonably concludes "in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous."  Terry, 392 U.S. at 30.

An officer may rely on information known by a team of officers involved in an investigation to provide justification for the stop.  United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) (citing United States v. Robinson, 119 F.3d 663, 666-67 (8th Cir. 1997)).  "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop."  United

States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007) (quoting Robinson, 119 F.3d at 666-67).

In the case at hand, the team of law enforcement officers monitoring the wiretaps and conducting surveillance had, at minimum, a reasonable and articulable suspicion of criminal activity.  They had intercepted information that the driver of the vehicle, Marques Martin, and his  associates were going to commit an imminent violent crime against Coquila.  The officers also knew from conversations between Marques Martin and Akbar Abdul-Ahad that Marques Martin likely had a firearm in his possession.  Once the vehicle was stopped, the officers were justified in searching the car for weapons in order to ensure their safety, because the officers reasonably believed that criminal activity was afoot and that Marques Martin was armed and dangerous.  Concern for officer safety also justified the pat-searches of the other occupants of the car.  See United States v. Roggeman, 279 F.3d 573, 577-78 (8th Cir. 2002) (citations omitted). These pat-searches yielded a small amount of marijuana and two window punches, which are commonly used in auto thefts and home invasions.  Based on the evidence known to the officers from the intercepted calls and surveillance, in combination with the evidence recovered during the search of the vehicle and the pat searches, the Court finds that probable cause existed to arrest Marques Martin, Donte Martin, Jimmy Martin, and Kevin Lewis.

In sum, the vehicle stop, searches, and arrests did not violate the Fourth Amendment, and none of the evidence seized on March 11, 2008 should be suppressed.

### III.   James King's Motion to Dismiss Counts One and Two of the Indictment

James King moves to dismiss counts one and two as duplicitous.  He specifically argues that count one alleges a conspiracy involving four controlled substances.  He does not explain why he believes count two is duplicitous.  The Government responds that alleging a single conspiracy to distribute multiple controlled substances is permissible.

11

"Duplicity is the joining in a single count of two or more distinct and separate offenses."
United States v. Street, 66 F.3d 969, 974 (8th Cir. 1995) (citations omitted). "[T]he allegation in
a single count of a conspiracy to commit several crimes is not duplicitous, for '[t]he conspiracy
is the crime, and that is one, however diverse its objects.'"  Bravermen v. United States, 317 U.S.
49, 54 (1942) (quotation and citations omitted).  In United States v. Calderin-Rodriguez, the
Eighth Circuit explicitly held that a single count alleging a conspiracy to distribute three
controlled substances was not duplicitous.  244 F.3d 977, 985 (8th Cir. 2001).

Here, count one charges twenty-two defendants with one conspiracy to distribute and
possess with the intent to distribute several controlled substances.  It is clear from the indictment
that the crime charged is conspiracy, even though its objectives are diverse.  Accordingly, count
one is not duplicitous.  Count two charges eight defendants with a single conspiracy to possess
firearms during and in furtherance of drug trafficking crimes.  The Court can discern no basis on
which to characterize count two as duplicitous, and it should not be dismissed as such.

## IV.    Motions to Suppress Identifications

Michael Reid and Kevin Lewis move to suppress eyewitness identifications.  At the
motion hearing, Kevin Lewis advised the Court that there were no eyewitness identifications of
him, and he agreed that his motion should be denied as moot.  In addition, there was no
testimony or other evidence regarding any identification of Michael Reid, and the Government
represented there was none.  Accordingly, his motion should also be denied as moot.

## V.    Motions to Suppress Evidence Obtained from Electronic Surveillance and Wiretapping

Michael Reid, Donte Martin, Kevin Lewis, and Chiffon Williams brought motions to

suppress evidence obtained from electronic surveillance and wiretaps.[2]  The following facts are taken from the testimony and exhibits introduced at the motion hearing.

### A.      Government Exhibit 1

Agent Voth prepared the affidavits for the wiretaps utilized in this investigation.  The first wiretap was applied for on February 5, 2008.  (Gov't Ex. 1.)  The subscriber of the target telephone was Noelle Brandner, and the user was Dentell Wesly Green.  Law enforcement authorities believed that Mohammad Abdul-Ahad, Steven Gant, James King, Robert El, Dentell Green, and others were illegally possessing firearms, using firearms in furtherance of drug trafficking crimes, laundering money, distributing and possessing controlled substances, and unlawfully using communication facilities.  In Agent Voth's thirty-four page affidavit, which the Court will only briefly summarize here, he explained that he expected to intercept communications regarding the location of resources, contraband, and distribution centers; the identities of co-conspirators; the nature and scope of the conspiracies; information about the price, quality, and quantity of controlled substances; the disposition of proceeds; and activities by members of the Black P Stone street gang.

Agent Voth discussed the results of an earlier wiretap authorized by the Honorable James M. Rosenbaum, which had alerted law enforcement agents specifically to the activities of Dentell Green.  Officers also saw Dentell Green purchase crack cocaine from Marco Tinnin, a member of the Rolling 60s Crip street gang and a subject of the previous wiretap.  Investigating agents came to believe that Dentell Green was a member of the Black P Stone gang, and they

---

[2] Chiffon Williams withdrew her motion during the hearing and it should be deemed withdrawn.  Additionally, although the Government has argued that Kevin Lewis does not have standing to challenge the admissibility of the wiretap evidence, the Court finds it more expedient to proceed to the merits.

knew that members of this gang trafficked cocaine in amounts up to half a kilogram.  Agent Voth described several conversations between Marco Tinnin and Dentell Green relating to drug activity.

Agent Voth also described several police encounters with Mohammad Abdul-Ahad, Steven Gant, and James King, including a car fire, a stolen handgun, and incidents of possession and distribution of controlled substances.  Agent Voth recounted the execution of several search warrants, which had yielded evidence of controlled substances, guns, and gang activity.  The agent summarized information obtained from several confidential and cooperating witnesses regarding drug possession and distribution by James King, Robert El, Mohammad Abdul-Ahad, Landon Jones, Chiffon Williams, Steven Gant, and Dentell Green.  He also described several pen registers that had been used in the investigation on the target telephone, as well as toll analyses.

Agent Voth wrote that the interception of wire communications was necessary to uncover the full scope, extent, and personnel involved in the suspected drug trafficking conspiracy; to identify suppliers and customers; and to learn about the management and disposition of proceeds.  He explained how normal investigative techniques had been tried without success, were unlikely to succeed, or were too dangerous to attempt.  He specifically explained why techniques such as physical surveillance, search warrants, consensual recordings, undercover agents, trash searches, sources of information, grand jury subpoenas and interviews, reviews of financial records, video surveillance, and electronic surveillance had not been or would not be effective.

The Honorable James M. Rosenbaum signed the order authorizing the wiretap at Government Exhibit 1 on February 5, 2008.

### B.    Government Exhibit 2

Agent Voth also prepared the affidavit for a wiretap application submitted to Judge Rosenbaum on February 28, 2008.  (Gov't Ex. 2.)  The subscribers of the two target telephones were Steven Gant and Simona Coleman.  Akbar Abdul-Ahad was named as the user of Coleman's telephone.  Law enforcement authorities sought the authorization for a wiretap to undercover evidence of illegal possession of firearms, use of firearms in furtherance of drug trafficking crimes, money laundering, distribution and possession of controlled substances, and unlawful use of communication facilities.  The potential interceptees were Mohammad Abdul-Ahad, Steven Gant, James King, Robert El, Akbar Abdul-Ahad, Robert Herron, Dentell Green, and Louis Sorrell.  The Court will only briefly summarize the thirty-nine page affidavit.

As with the first wiretap application, Agent Voth explained what information he expected to intercept.  He explained how the potential interceptees had communicated and conspired with each other and others to distribute and possess illegal controlled substances.  Agent Voth provided details about the investigation thus far, including much of the information that had been included in his prior affidavit.  He listed specific encounters with police, intercepted calls to and from the target telephones, information from confidential informants and cooperating witnesses, information obtained from pen registers, and toll analyses.  He detailed how normal investigative procedures had been tried without success, were unlikely to succeed if tried, or were too dangerous to attempt.  Judge Rosenbaum authorized the second wiretap on February 28, 2008.

### C.    Government Exhibit 3

On April 1, 2008, the Government applied for authorization to intercept wire communications to and from telephones subscribed to Renee Herron and "Streetside Ent," which were used by Robert Herron and Marques Martin.  (Gov't Ex. 3.)  Law enforcement authorities

sought the wiretap authorization to investigate the crimes of illegal possession of firearms, use of firearms in furtherance of drug trafficking crimes, money laundering, distribution and possession of controlled substances, and unlawful use of communication facilities.  The potential interceptees were Mohammad Abdul-Ahad, Buster Gaston, Streetside Entertainment, James King, Robert El, Akbar Abdul-Ahad, Robert Herron, Marques Martin, and Dentell Green.

As with previous applications, Agent Voth comprehensively described the ongoing, multi-agency investigation and the information uncovered thus far.  He explained why there was probable cause to believe that authorities would intercept communications concerning the location, resources, and distribution centers; the identities of co-conspirators; the nature, scope, and extent of the conspiracy; the price, quality, and quantity of controlled substances; details about the administration and management of the illegal drug business; and discussions related to the Black P Stone gang and the possession and use of weapons by prohibited persons.  Agent Voth explained how the potential interceptees communicated and conspired with each other and others to distribute and possess illegal controlled substances, to possess and use weapons, to launder money, and to commit check forgery and bank fraud.  He listed specific intercepted calls between the new targeted telephones and previously targeted telephones.  Finally, he explained how traditional investigative procedures had been tried without success, were unlikely to succeed if tried, or were too dangerous to attempt.  Judge Rosenbaum authorized the third wiretap on February 28, 2008.

### D.    Government Exhibit 4

Government Exhibit 4 contains an application for an extension of the interception of wire communications for the telephone targeted in Government Exhibit 2.  The application for the extension was made on March 28, 2008, and Agent Voth provided the supporting affidavit.  In

addition to much of the information provided in his previous affidavit, Agent Voth explained that intercepted calls of the targeted telephone had revealed Akbar Abdul-Ahad's participation in a bank fraud scheme involving several banks and co-conspirators, gang activity, the use and possession of firearms, and drug distribution.  Law enforcement officials had learned that Akbar-Abdul-Ahad conducted much of this activity from a store he managed, Meal Ticket Foods. Agent Voth described several previously intercepted conversations between Akbar Abdul-Ahad and Robert Herron, James King, Marques Martin, John Wooldridge, Tavia Anderson, Vito Williams, Buster Gaston, and others.  The content of these calls related to recent incidents of drug distribution, bank fraud, and violent crimes.  Agent Voth explained the need for the extended interception of calls and further explained why traditional investigative techniques had been tried without success, were unlikely to succeed if tried, or were to dangerous to attempt. Judge Rosenbaum authorized the extended interception on March 28, 2008.

> **E.    Minimization**

For each authorized wiretap, Agent Voth and an Assistant United States Attorney held a minimization meeting prior to any interception.  At the meeting, all law enforcement officers who would be monitoring the calls received a copy of a memorandum detailing techniques on minimizing calls, and the procedure was also verbally communicated to the officers.  Officers were instructed how to determine whether information was "pertinent" to the investigation and when to minimize or terminate a call.  The memorandum specifically required all monitoring agents to maintain a log of all communications intercepted, the time and duration of each interception, whether the call was outgoing or incoming, the number called if outgoing, the participants to the conversation, and the subject of the calls.  Monitoring officers also reviewed the affidavits, applications, and orders relating to the wiretap application.

During the interception period, law enforcement agents monitored incoming and outgoing calls with a voicebox. The voicebox is a computer containing built-in features such as a clock and screen alerts to notify monitors when calls are made and audio is received. The voicebox contains only the audio recordings; there is no written information stored. If a call was minimized, it was not recorded, and no agent ever heard it. Of the 1875 completed calls lasting more than two minutes, only 36 were not properly minimized. The monitoring agents did not keep a formal log of incoming and outgoing calls, despite the requirement of the minimization memorandum.

### F.    Discussion

Only Michael Reid and Akbar Abdul-Ahad brought particular challenges to the wiretaps. Michael Reid argues that evidence seized pursuant to Government's Exhibit 2 must be suppressed because there was no necessity for the wiretap and because there was no evidence that calls were properly minimized. Michael Reid also notes that the monitoring agents failed to maintain a log of calls as required by the minimization memo. Akbar Abdul-Ahad challenges the necessity for all of the wiretaps as well as the minimization procedure.

### 1.    Necessity

An application for interception of wire communications must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The intent of the requirement is "to restrict wiretaps to those which are necessary as well as reasonable." United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976). However, "Congress did not require the exhaustion of 'specific' or 'all possible' investigative techniques before wiretap orders could be issued." Id. (citation omitted). The Eighth Circuit views the

18

purpose of the necessity requirement as an assurance "that wiretaps are not routinely employed as the initial step in an investigation." United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990) (citing Daly, 535 F.2d at 438). Thus, while law enforcement officers must first attempt some typical investigative techniques, they are not required to exhaust all possible investigative techniques. Id. (citations omitted).

In this case, none of the wiretaps utilized in this case were employed as the initial step in an investigation. Before applying for the wiretaps, law enforcement officials engaged in surveillance, conducted traffic stops, executed search warrants, obtained information from informants and cooperating witnesses, analyzed calls obtained pursuant to other authorized wiretaps, obtained pen registers, and performed toll analyses. Agent Voth explained that these investigative techniques had been partially successful but had not revealed the full scope and extent of the crimes under investigation. He discussed in detail how each technique had been attempted, what the results were, and why additional use of the technique would have limited value. He also specifically explained why techniques such as undercover agents, trash searches, and grand jury subpoenas and interviews would not be effective. The Court finds that each of Agent Voth's affidavits sufficiently established the necessity for the corresponding wiretap.

## 2.    Minimization

Under 18 U.S.C. § 2518(5), surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." Whether wiretap monitors adequately minimize non-pertinent calls is a question of objective reasonableness. Macklin, 902 F.2d at 1328 (citations omitted). Neither Michael Reid nor Akbar Abdul-Ahad provided any evidence that communications were not properly minimized. Indeed, neither defendant so much as identified a single call for the Court to review. The only evidence

19

before the Court is that the monitoring officers were properly instructed on intercepting calls and that they appropriately intercepted, minimized, and recorded calls.[3]  The Court concludes that the monitoring agents acted reasonably in minimizing non-pertinent calls.  See id.

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant Mohammad Queadir Abdul-Ahad's Motion to Suppress Confessions or Admissions (Doc. No. 390) be **DEEMED WITHDRAWN**;

2.    Defendant Mohammad Queadir Abdul-Ahad's Motion to Suppress Search and Seizure Evidence (Doc. No. 392) be **DENIED** with respect to the search warrants contained in Government Exhibits 5, 6, 8, 9, 10, and 11; and Magistrate Judge Keyes will separately address the Motion as it pertains to Government Exhibits 7 and 12;

---

[3] The Court is troubled by the monitoring agents' failure to comply with the minimization memorandum's requirement of keeping a log of the intercepted calls.  The memorandum specifically instructed,

> The monitoring agents should maintain a contemporaneous log, by shifts, of all communications intercepted, indicating the reel and footage locations of each communication; the time and duration of the interception; whether outgoing or incoming in the case of telephone conversations; the number called if the call was outgoing; the participants, if known; the subject and a summary of the content of pertinent conversations. . . .  When the interception of a communication is terminated for the purposes of minimization, that fact should be noted.

(Gov't Ex. 1 at 85.)  The Government conceded at the hearing that no such log was maintained.

Ordinarily, the Government proves proper minimization, at least in part, by providing the court with a log of intercepted communications.  E.g., United States v. Van Horn, 789 F.2d 1492, 1502 (11th Cir. 1986); United States v. Marcy, 777 F. Supp. 1400, 1405 (N.D. Ill. 1991).  Under the present circumstances, however, where there is no evidence that wiretap monitors unreasonably intercepted, minimized, or recorded calls, the Court is not persuaded that the appropriate remedy for the failure to maintain the requisite logs is suppression of the intercepted communications.

3.      Defendant Mohammad Queadir Abdul-Ahad's Motion to Suppress Evidence Obtained Through Search (Doc. No. 394) be **DENIED** with respect to the search warrants contained in Government Exhibits 5, 6, 8, 9, 10, and 11; and Magistrate Judge Keyes will separately address the Motion as it pertains to Government Exhibits 7 and 12;

4.      Defendant James Edward King's Motion to Dismiss Counts One and Two of the Indictment (Doc. No. 264) be **DENIED**;

5.      Defendant Akbar Saleem Abdul-Ahad's Motion to Suppress Search and Seizure Evidence (Doc. No. 354) be **DENIED** with respect to the search warrants contained in Government Exhibits 5, 6, 8, 9, 10, and 11; and Magistrate Judge Keyes will separately address the Motion as it pertains to Government Exhibits 7 and 12;

6.      Defendant Michael Douglas Reid's Motion to Suppress Statements (Doc. No. 524) be **DENIED AS MOOT**;

7.      Defendant Michael Douglas Reid's Motion to Suppress Identification (Doc. No. 525) be **DENIED AS MOOT**;

8.      Defendant Michael Douglas Reid's Motion to Suppress Evidence Obtained from Search and Seizure (Doc. No. 533) be **DENIED** with respect to the search warrants contained in Government Exhibits 5, 6, 8, 9, 10, and 11; and Magistrate Judge Keyes will separately address the Motion as it pertains to Government Exhibits 7 and 12;

9.      Defendant Michael Douglas Reid's Motion to Suppress Evidence Obtained from Electronic Surveillance and Wiretapping (Doc. No. 534) be **DENIED**;

10.     Defendant Donte Martin's Motion to Suppress Evidence (Doc. No. 461) be **DENIED** with respect to the search warrants contained in Government Exhibits 5, 6, 8, 9, 10, and 11; and Magistrate Judge Keyes will separately address the Motion as it pertains to Government Exhibits 7 and 12;

11.     Defendant Donte Martin's Motion to Suppress Statements (Doc. No. 462) be **DENIED AS MOOT**;

12.     Defendant Donte Martin's Motion to Suppress Electronic Surveillance (Doc. No. 467) be **DENIED**;

13.     Defendant Kevin Lewis' Motion to Suppress Statements (Doc. No. 324) be **DENIED**;

14.     Defendant Kevin Lewis' Motion to Suppress Wiretap Evidence (Doc. No. 326) be **DENIED**;

15.     Defendant Kevin Lewis' Motion to Suppress Eyewitness Identifications (Doc. No. 327) be **DENIED AS MOOT**;

16.     Defendant Kevin Lewis' Motion to Suppress Eyewitness Identifications (Doc. No. 328) be **DENIED AS MOOT**;

17.     Defendant Kevin Lewis' Motion to Suppress Evidence Obtained from Search and Seizure (Doc. No. 332) be **DENIED** with respect to the search warrants contained in Government Exhibits 5, 6, 8, 9, 10, and 11; and Magistrate Judge Keyes will separately address the Motion as it pertains to Government Exhibits 7 and 12;

18.     Defendant Kevin Lewis' Amended Motion to Suppress Evidence Obtained from Search and Seizure on March 11, 2008 (Doc. No. 511) be **DENIED**;

19.     Defendant Chiffon Williams' Motion to Suppress Evidence (Doc. No. 216) be

**DENIED** with respect to the search warrants contained in Government Exhibits 5, 6, 8, 9, 10, and 11; and Magistrate Judge Keyes will separately address the Motion as it pertains to Government Exhibits 7 and 12; and

20.     Defendant Chiffon Williams' Motion to Suppress Evidence Obtained from Electronic Surveillance and Wiretapping (Doc. No. 217) be **DEEMED WITHDRAWN**.

Dated: October 27, 2008

 s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by  **November 11, 2008** , a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.